438

Robert L. JONES and Mary Jones
(Plaintiffs), Appellants-
Respondents,

v.

ATLANTA LIFE INSURANCE COMPANY,
a Corporation (Defendant), Respondent-
Appellant.

Nos. 29430, 29438.

St. Louis Court of Appeals.

Missouri.

April 17, 1956.

Motion for Rehearing or to Transfer to
Supreme Court to Modify Opin-
ion Denied May 11, 1956.

N. Murry Edwards, Ninian M. Edwards, St. Louis, for appellants-respondents.

Silas E. Garner, St. Louis, for respondent-appellant.

HOUSER, Commissioner.

This is the second appeal in an action upon two policies of insurance issued by defendant Atlanta Life Insurance Company on the life of Elvira Jones. On the first appeal we affirmed the order of the trial judge granting a new trial. Jones v. Atlanta Life Ins. Co., Mo.App., 247 S.W.2d 314. Reference is made to our first opinion for a statement of the salient facts. On remand defendant amended its answer by alleging an additional defense: that in-

sured was not in sound health on the date of issuance of the policies but was suffering from a disease of the blood vessels, high blood pressure, or hypertension and apoplexy. (Paragraph 3 of the "health clauses" provided that the policies should not take effect if on the policy date "the insured be not in sound health.") On the second trial the jury awarded plaintiffs $1,719.90, including $1,000 for attorneys' fees, $42.10 for vexatious delay and $256.80 interest. The trial judge sustained defendant's motion for a new trial, set aside and vacated the verdict and judgment and entered a new judgment for plaintiffs for $105.50 plus interest, in the aggregate sum of $170.80, and costs. Plaintiffs appealed from the order and judgment. Defendant appealed from the judgment entered against it for $170.80. Defendant filed a motion to set aside the latter judgment and to enter judgment for defendant and then re-filed its notice of appeal, after the court overruled the latter motion. The separate appeals, submitted together, will be disposed of in one opinion.

■ Defendant denies and plaintiffs assert that plaintiffs made a submissible case on the question of the cause of Elvira's death. Contending that the undisputed evidence shows that on April 9, 1945, the date of issuance and delivery of the policies, Elvira was not in sound health but was afflicted with a disease which caused or contributed to her death on April 11, 1945, defendant cites numerous cases which hold that admissions against interest appearing in the proofs of death, unless contradicted or explained by further evidence, are binding upon the beneficiaries in a suit on a policy of life insurance, and preclude recovery. It is urged that the coroner's post-mortem report, submitted to the insurance company as a part of the proofs of death, showed that the cause of death was cerebral hemorrhage, showed that there were no marks of external violence, and revealed "arteriosclerotic changes of the aorta and cerebral vessels;" that the death certificate showed that the immediate cause of death was cerebral hemorrhage and contained a blank space following question 22: "If death was

due to external causes, fill in the following: ————————————." We are, however, of the opinion that the question of death by fall or death by disease was for the jury, for the reason that other facts were brought forward to explain or contradict the effect of these admissions. There was uncontradicted testimony that a fall occurred. Dr. Frank Niesen, testifying for plaintiffs, after examining the coroner's findings and in answer to a hypothetical question, gave his opinion that it would have been very possible that Elvira's fall caused a blood vessel in her brain to rupture and cause her death; that her death could have been from the fall; that even though there were no signs of external injury or damage to the head the mere fall, with its consequent jarring or shaking of the soft brain tissue inside the hard skull, would be sufficient to cause a hemorrhage. That the cause of the hemorrhage was injury was borne out, according to the doctor, by the fact that the membranes of the brain were hemorrhagic; that as a rule you would not find the membrane of the outside covering of the brain (the dura) hemorrhagic in the case of a stroke from hypertension. In such case the hemorrhage would be confined to the place of the rupture (in this case in the pons, or middle brain) and would not extend to the dura, which "did show some signs of trauma." He testified that this was not a normal brain; that there were arteriosclerotic changes of the aorta and cerebral vessels; that arteriosclerosis is a disease of the blood vessels; that the blood vessels were diseased; that the deceased had had the disease "for some time;" that it was a chronic condition which was "there a couple of days before death," and that it was a diseased blood vessel that ruptured. But he would not say that the hemorrhage would not have occurred in a normal brain. He cited the example of athletes with perfectly normal brains who, a few days after the violence of athletic contests, die of cerebral hemorrhage. Conceding that the arteriosclerotic changes probably did have something to do with "the acceleration of those bursted blood vessels" and that if she had not had the fall with a certain amount

of violence the diseased brain would not have ruptured (whereas with the violence the diseased blood vessels ruptured) the doctor likened the situation to an automobile tire, explaining that if you drive an automobile 30 miles per hour you might not have a blowout for years but if you drove 70 miles an hour "you would have a blowout." The clear import of Dr. Niesen's testimony is that the blood vessels of the brain ruptured because of unusual movements of violence experienced in the fall. Considering the fact of the fall, the testimony of Dr. Niesen, and that of Mary Jones that Elvira was "fine," in good health, performing all of her housework every day, including washing, ironing, cooking, keeping house and taking care of a baby up to the date of her death and that she was not suffering from high blood pressure and hypertension when she took out the policies, we cannot say as a matter of law that plaintiffs did not make a submissible case of death from cerebral hemorrhage caused by a fall or that plaintiffs are precluded as a matter of law from any recovery by reason of the sound health provisions of the policies.

 Plaintiffs' principal point is that the court erred in sustaining defendant's motion for a new trial, giving as the reason that there was no substantial evidence to support the issue of vexatious delay. Plaintiffs urge that the following evidence was amply sufficient to submit the question: After defendant declined to pay plaintiffs' claim, counsel employed to represent the beneficiaries wrote defendant on April 19, 1945 advising of his employment. He carried on a correspondence with defendant for a period of time in 1945, finally receiving a letter from defendant in June, 1945 denying liability. Again counsel wrote defendant in October, 1946 demanding payment and again defendant refused to pay. At the first trial defendant relied solely on the defense that insured died of apoplexy which limited its liability, and defendant did not assert the defense that insured was not in sound health at the date of the issuance of the policies until May 24, 1955. Plaintiffs assert that defendant was not seeking in good faith to try out adequate defenses and point to the assertion of the sound health defense for the first time in May, 1955 as an evidence of a lack of good faith. Bad faith on the part of defendant has not been shown. As stated in our previous opinion, 247 S.W.2d loc. cit. 317:

"* * * the facts in defendant's possession strongly supported its contention that the insured was not in sound health upon the date of the issuance of the policies, but for as much as two years before had suffered from and had been treated for hypertension, which had caused or contributed to cause the cerebral hemorrhage from which she died. In other words, the jury would have been amply entitled to find that defendant had, refused payment in good faith and upon a reasonable ground, even though, when it undertook to defend in court, it modified its stand to the extent of admitting liability for one-fourth of the face amount of the policies."

Plaintiffs take the position that after the first trial defendant abandoned its claim that the insured died of apoplexy, thus conceding that that defense could not be established and entitling plaintiffs to have the issue of vexatious delay submitted to the jury, under the ruling in Colley v. National Live Stock Ins. Co., 185 Mo.App. 616, 171 S.W. 663. Although defendant's first amended answer filed May 24, 1955 did not specifically allege in paragraph 4 that Elvira died from *apoplexy* it did charge that she died from a disease "as shown by the death proofs" limiting its liability to one-fourth and in paragraph 5 alleged that on the date of issue of the policies Elvira was suffering from a "disease of the blood vessels, sometimes referred to as high * * * blood pressure, or hypertension and apoplexy." By its Instruction No. 2 defendant submitted the defense of limited recovery upon a finding of death from "cerebral hemorrhage caused by high blood pressure." There was no abandonment of the defense. Plaintiffs point to the fact that defendant has declined to pay during the pendency of two trials in circuit court

and two appeals in this court, a period of more than ten years. The mere passage of time, however, is of no advantage to plaintiffs if defendant was justified in refusing to pay in the first instance. Plaintiffs further urge that defendant failed to offer any proof in substantiation of its claim that insured's death resulted from high blood pressure, or that insured was not in sound health, or that insured misrepresented her health to the company, or that the matter misrepresented actually contributed to the cause of death of insured. At the time it denied liability defendant had before it the certificate of death, the coroner's post-mortem report and the death claim report of the Retail Credit Company, described in our previous opinion and referred to herein. These documents, introduced in evidence at the second trial, indicated that there were arteriosclerotic changes of the cerebral vessels; that Elvira died of cerebral hemorrhage and that there were no marks of external violence. Officer Fred Ahrens, whose testimony at the inquest was preserved, had testified to no marks of violence, and no history of injury, but a history of stroke two years previous. Mary Jones testified at the inquest that she found her mother lying across the bed; that Elvira "couldn't say anything, like the time when she had the stroke * * * a couple of years ago" and further testified that "she (Elvira) didn't have any falls or an accident of any kind." Defendant had in its files a statement signed by Mary Jones dated June 8, 1945 that her "mother had a stroke about 2 years ago and was in Homer G. Phillips Hospital about 2 weeks. For the past two years she had been going to a Dr. Kosspust of 1400 S. Broadway on the average of once every three or four months. He was giving her medicine for her high blood pressure." At the trial Mary Jones, asked if she told defendant's investigator that Elvira was suffering from hypertension and high blood pressure when she took out the insurance, said "Yes, I guess so." Dr. John J. Thomas, testifying for defendant, stated that he performed the autopsy; that the cause of death was cerebral hemorrhage, which is a hemorrhage caused by a sudden rupture of a blood vessel inside the brain; that the blood vessels of this brain were diseased and that he found chronic arteriosclerosis; that hypertension is a symptom of high blood pressure and of arteriosclerosis and that while cerebral hemorrhage can be caused by trauma such as a fall there were no marks of trauma anywhere on the body, either on the skull or elsewhere. When asked to account for the hemorrhage Dr. Thomas said you would have to assume that she had high blood pressure. His final testimony was that she had this cerebral hemorrhage "because of the diseased vessels."

There certainly was present in this case a question of fact upon which there could be an honest difference of opinion whether the proximate cause of death was disease or accident. In such a situation it is error to submit the question of vexatious refusal to pay. Young v. New York Life Ins. Co., 360 Mo. 460, 228 S.W.2d 670. The trial court properly sustained the motion for new trial on the ground that there was no substantial evidence to support the issue of vexatious delay.

The next question is whether the court erred in ruling as a matter of law that Elvira died from apoplexy, as a consequence of which limited benefits were payable, and in rendering judgment therefor. Plaintiffs assert the court's order was not supported by the evidence, was not responsive to any motion filed in the case and was untimely, 30 days having expired following the reception of the verdict and the entry of the judgment. Pointing out that there is no medical evidence that Elvira died from "apoplexy" or that apoplexy is the same as cerebral hemorrhage, plaintiffs complain of the action of the trial court in making this "astute" finding as a matter of law. Webster's New International Dictionary, 2d Ed. defines apoplexy as "A sudden diminution or loss of consciousness, sensation, and voluntary motion, caused by hemorrhage into the brain from rupture of an artery, or by sudden anemia of a part of the brain from obstruction of its artery, either by the

formation of a clot or by the lodgment of an embolus;—commonly called stroke." In usual and ordinary acceptance the terms "cerebral hemorrhage," "stroke" and "apoplexy" are used interchangeably. There was no need of medical evidence on this point.

Plaintiffs' objection to the action of the trial court in rendering judgment for plaintiffs for one-fourth of the amount of the policies, however, is of serious concern. A review of the procedural situation is necessary for a full understanding of the problem presented. Plaintiffs' action for the face amount of the policies was contested on two grounds: first, that there was no liability whatever because of the sound health provisions and second, that in any event the liability was limited to one-fourth of the face amount of the policies under paragraph 4, Sec. 2, for the reason that the insured died from a listed disease. Defendant did not move for a directed verdict at the close of all the evidence under § 510.280 or file a motion within 10 days after the reception of the verdict to have the verdict and judgment set aside and to have judgment entered in accordance with its motion for a directed verdict, under § 510.290. All citations of statute section numbers refer to RSMo 1949, V.A.M.S. Defendant did file a motion for new trial but that motion was not joined with a motion for judgment and the judgment rendered was not prayed for orally or in any pleading or motion. After submission of the motion for new trial and approximately 60 days after reception of verdict and entry of judgment, the court entered the order of August 5, 1955 sustaining the motion for new trial and setting aside the verdict and judgment of June 7, and then, on the court's own motion, entered a new judgment for plaintiffs for $105.50 plus interest and costs. This action was not in response to any motion or request of the parties, plaintiffs or defendant, both of whom appealed therefrom. We find no authority for this procedure. It is true that in cases tried to the court without a jury the court, on a motion for new trial, may make new findings and direct the entry of a new judgment. § 510.330. This case, however, was tried to a jury. After jury trial, verdict, discharge of the jury and entry of judgment on the verdict no power remained in the court, on a motion for new trial, to make and substitute its own findings for those of the jury, Kaimann v. Kaimann Bros., Mo.App., 182 S.W.2d 458, and to make its own assessment of the recovery, Jaeger v. Agnew, Mo.App., 252 S.W.2d 847, thus invading the province of the jury as the body constituted to try the facts. Kaimann v. Kaimann Bros., supra. The only action which the court was empowered to take at that juncture was to sustain or overrule the motion for new trial. When it sustained defendant's motion for new trial and set aside the verdict and judgment of June 7, 1955 its action left the case for trial de novo as though there had been no trial, Willis v. Willis, Mo.App., 274 S.W.2d 621; Smith v. Smith, Mo.App., 176 S.W.2d 647; Brayton v. Gunby, Mo.App., 267 S.W. 450; Deiermann v. Bemis Bros. Bag Co., 144 Mo.App. 474, 129 S.W. 229, opinion adopted 163 Mo.App. 522, 143 S.W. 1197, left "'no basis for the entry of a judgment'", Willis v. Willis, supra [274 S.W.2d 624]; Porter v. Chicago, B. & Q. R. Co., 325 Mo. 381, 28 S.W.2d 1035, and did not permit rendition of a new judgment without retrial. Willis v. Willis, supra; Davis v. Lynn, 354 Mo. 1181, 193 S.W.2d 609; Alt v. Dines, 227 Mo. 418, 126 S.W. 1035; Hurley v. Kennally, 186 Mo. 225, 85 S.W. 357. The court was not acting upon the basis of any proper motion made or filed, and the cause had not been resubmitted to it, sitting as a jury, for determination.

The judgment of the circuit court in favor of plaintiffs and against defendant for $105.50 plus interest should be reversed, and the cause remanded for a new trial in accordance with the views herein expressed.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

Accordingly, the judgment of the circuit court of August 5, 1955 in favor of plaintiffs and against defendant in the sum of $105.50 plus interest is reversed, and the cause remanded for a new trial in accordance with the views expressed in the opinion.

ANDERSON, P. J., MATTHES, J., and SAM C. BLAIR, Special Judge, concur.